# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RENEW ENERGY LLC, | ) | Case No. 09-10491 |
| | ) | |
| Debtor. | ) | Hon. Robert D. Martin |

**MOTION OF DEBTOR RENEW ENERGY LLC FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTOR TO PAY OR HONOR CERTAIN PREPETITION OBLIGATIONS (I) FOR EMPLOYEE WAGES, SALARIES, AND OTHER COMPENSATION; AND(II) FOR CONTRIBUTIONS TO BENEFIT PLANS; (B) AUTHORIZING THE CONTINUATION OF CERTAIN EMPLOYEE BENEFIT PLANS AND PROGRAMS POSTPETITION; (C) DIRECTING FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS; AND (D) APPROVING LIMITED NOTICE**

Renew Energy LLC, debtor and debtor in possession herein ("Debtor"), requests entry of an order, in the form filed in connection with this Motion or otherwise submitted to the Court (the "Order"), (a) authorizing, but not directing, the Debtor (i) to pay the Employee-Related Obligations (as defined herein); (ii) to honor certain policies regarding vacation and holiday pay as described herein; and (b) authorizing and directing West Pointe Bank to receive, process, honor, and pay all checks presented and requested electronic funds transfers that are related to the foregoing. In support, the Debtor states:

**JURISDICTION**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334 and the general order of reference of the United States District Court for the Western District of Wisconsin.

2. Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

3. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

4. The statutory bases for the relief requested herein are 11 U.S.C. §§105 and 363(b), 363(c), 507(a)(4), 507(a)(5), 541(b), 1107(a), 1108, and 1129(a)(9)(B) and Rule 6003 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## GENERAL BACKGROUND

A. **The Chapter 11 Case**

5. On January 30, 2009 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Code").

6. The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to §§1107 and 1108 of the Code.

7. No official committee, trustee, or examiner has been appointed in this case.

B. **Business Operations of the Debtor and the Chapter 11 Filing**

8. The Debtor is a privately owned Wisconsin limited liability company, having five (5) individual members, each of whom owns twenty percent (20%) of the membership interests (equity) in the Debtor. The Debtor has no parents or subsidiaries. The address of the Debtor's principal place of business is N5355 Junction Road, Jefferson, Wisconsin 53549. Each member is a Wisconsin resident.

9. The Debtor owns and operates a dry corn fractionation process ethanol plant (the "Plant") in Aztalan, Wisconsin. The Plant has a production capacity of 130 million gallons of ethanol per year.

10. Ethanol is a type of alcohol that is used as a blend component in the U.S. gasoline fuel market to increase octane and reduce tailpipe emissions. Ethanol is mandated to go into the fuel stream by the federal government through the Renewable Fuel Standard (the "RFS"). The

RFS calls for escalating volumes of ethanol to be purchased and blended into gasoline. By 2015, the RFS standards will require 15 billion gallons of ethanol a year.

11. In addition to ethanol, the Plant produces distillers dried grains with solubles (or "DDGS", a high-nutrient animal feed additive), corn bran, corn meal, food-grade corn oil, and other corn-derived products; the Debtor consumes about 20% of the annual corn production of the State of Wisconsin.

12. The Debtor's entire business consists of selling products produced by the Plant. For the fiscal year ended December 31, 2008, the Debtor had revenues of approximately $184,236,000. It has approximately $150,478,000 in pre-petition secured debt and approximately $37,000,000 of prepetition unsecured (principally trade) debt.

C. **Events and Circumstances Leading to the Chapter 11 Filing**

13. The Debtor is subject to significant market risk with respect to the price of ethanol, its principal product, and the price and availability of corn, the principal raw material used in the Debtor's ethanol production process. However, corn prices and ethanol prices do not necessarily correlate, because each market is affected by unique supply and demand conditions. Factors affecting the grain markets – such as weather, crop conditions, and international trade -- are distinct from those that affect ethanol – such as crude oil and gasoline supply and demand factors, the regulatory climate, and the availability of other fuel oxygenates. Historically, the Debtor has not been able to pass along increased corn costs to its customers and such higher corn prices have resulted in lower profit margins. Moreover, although corn is the Debtor's most significant production cost, other major costs include natural gas, transportation, and the price of ethanol purchased from other producers to satisfy supply commitments.

14. The Debtor's business difficulties arise from a "margin squeeze" caused by increasing prices for raw corn and decreasing retail prices for ethanol. Partly, this has resulted from decreasing prices for competing fuel products produced by the global current economic downturn. Principally, however, the Debtor's gross margin depends on the spread between ethanol and corn prices. In early 2006, this spread was very favorable to ethanol producers, but, since at least September 2007, it has tightened to the point that the Debtor has been challenged in operating day-to-day on the gross margins available under the current spread.

15. This margin squeeze has caused gross margins to approach zero, making debt service impossible and leading to a liquidity crisis where operating cash can only be obtained by accelerating collections, sometimes on a basis of requiring payments by customers with 24 hours of sale. The inability to extend even 48 hours credit to customers only worsens the Debtor's competitive position.

16. Notwithstanding the deterioration of the Debtor's margins, it believes that its going concern value can be stabilized, and, indeed, enhanced, by the acquisition of postpetition financing to allow the Debtor to operate its business at least through June 30, 2009, by which point the Debtor's senior operations personnel anticipate an improvement in market conditions and a more favorable environment for the sale of the Plant. Within that period, the Debtor is committed to an aggressive marketing program being developed with William Blair & Company and an actual sale of the Debtor's operating assets to a buyer under Code §363.

**BACKGROUND REGARDING EMPLOYEE-RELATED OBLIGATIONS**

**Employee Wages**

17. The Debtor employs approximately eighty (80) people, approximately 61 in hourly positions and approximately 19 in salaried positions (collectively, the "Employees").

18. The Employees are paid every two weeks, on Friday, for services attributable to the two weeks ended on the previous Friday (including overtime for hours in excess of 40 per week) (the "Wages"). The Debtor made a payroll on January 23, 2009, for the period January 3 through January 16, 2009 (the "Prior Payroll"); its next payroll is due February 6, 2009, for the period January 17 through January 30, 2009 (the "February 6 Payroll")[1]. Therefore, the February 6 Payroll will include amounts owed to the Employees for services rendered during the January 17 though January 29 prepetition period.

19. Debtor paid Wages to the employees in the Prior Payroll of $123,870.79 and estimates that Wages will be approximately the same for the February 6 Payroll. Prorating for the thirteen prepetition days including in the fourteen-day February 6 Payroll period (such thirteen days, the "Prepetition Payroll Period"), Debtor estimates that the February 6 Payroll will include approximately $115,023 on account of prepetition Wages. No Employee will receive more than the statutory priority amount of $10,950 provided under Code §507(a)(4); the average amount paid to Employees for prepetition Wages would be approximately $1,438.

20. The only "insider" (as defined in Code §101(31)) to be paid prepetition Wages under this Motion is Jeffrey M. White, who is one of six directors of the Debtor, but who is *not* an owner of the Debtor. More relevant to this Motion, however, is that Mr. White is the Debtor's Chief Executive Officer ("CEO"), is paid a salary in connection with his services in that position, and is proposed to be paid under this Motion in his capacity as CEO, and not on account of his position as a director.

---

[1] As of the preparation of this Motion, exact figures for the February 6 Payroll were not yet available, but the Debtor anticipates that the components of, and dollar amounts relating to, the February 6 Payroll will be generally equivalent to the Prior Payroll in all material respects.

QB\7298134.3

**Deductions from Employee Wages**

21. In the ordinary course of its business, the Debtor deducts certain amounts from each Employee's gross pay in each pay period including, without limitation, amounts related to court-ordered garnishments, court-ordered spousal and/or child support obligations of the Employee, 401(k) plan contributions, Employee contributions to health, dental, and vision insurance premiums, contributions to health security accounts, contributions to other Employee-specified accounts (*e.g.*, savings accounts), and premiums for employee-paid life insurance (collectively, the "Deductions"). Such amounts are forwarded to the appropriate recipient. The Deductions are simply portions of the gross Wages of the Employees that are directed to specified purposes, rather than paid directly to the Employee; as such, the total amount of Deductions attributable to prepetition period is included within the amount of prepetition Wages described above.

**Withholdings Taxes and Employer-Paid Payroll Taxes**

22. The Debtor is required by law to withhold from its Employees' pay for each pay period amounts related to federal and state income, Social Security, and Medicare taxes (the "Withholding Taxes"). For the Prior Payroll, the Withholding Taxes totaled approximately $44,061; assuming approximately the same amount for the February 6 Payroll, Employer-Paid Payroll Taxes prorated for the Prepetition Payroll Period will be approximately $40,914.

23. The Debtor is also required to pay, out of its own funds, Social Security and Medicare taxes, as well as federal unemployment insurance taxes and state unemployment/disability insurance taxes (the "Employer-Paid Payroll Taxes"). For the Prior Payroll, the Employer-Paid Payroll Taxes totaled approximately $19,756; assuming

approximately the same amount for the February 6 Payroll, Employer-Paid Payroll Taxes prorated for the Prepetition Payroll Period will be approximately $18,345.

**Employee Reimbursements**

24.     In the ordinary course of its business, the Debtor's Employees may incur expenses out of their own funds for the benefit of the Debtor or in connection with their employment with the Debtor for which they would be entitled to be reimbursed ("Employee Reimbursements"). Debtor believes that any such prepetition Employee Reimbursements are *de minimis*; the only such prepetition Employee Reimbursements of which the Debtor is aware are (a) the sum of $52.74 for goods purchased prepetition by an Employee for use by the Debtor and (b) Employee Reimbursements for two of Debtor's Employees who are reimbursed for business cell phone usage and have submitted reimbursement requests of $95.00 and $35.00, respectively.

25.     Nonetheless, some other Employees may not have submitted requests for prepetition Employee Reimbursements; the Debtor estimates that total prepetition Employee Reimbursements will be under $500. Debtor therefore asks for permission to pay such Employee Reimbursements for prepetition periods if any should be submitted, so long as they qualify for reimbursement under the ordinary policies of the Debtor in place as of the Petition Date.

**Employer Contributions to Certain Benefit Plans**[2]

26.     401(k) Plan:  In the ordinary course of its business, the Debtor provides funds to match 50% of the first 6% of each Employee's gross wages and salary contributed by such Employee to the Debtor's 401(k) retirement plan (the "Employer 401(k) Amounts"). Approximately 33 Employees participate in the 401(k) plan. Based upon the Employer 401(k)

---

[2] The Debtor maintains dental and vision insurance plans for which premiums were paid prepetition through February; Debtor also finances its worker's compensation insurance premiums through a company called AICCO and, prepetition, paid amounts necessary to provide coverage through February 2009.

QB\7298134.3

Amounts for the period covered by the Prior Payroll, the Debtor estimates that the Employer 401(k) Amounts paid for the period covered by the February 6 Payroll will be approximately $2,365 and that the portion of that amount prorated for the Prepetition Payroll Period will be approximately $2,196.

27. <u>EAP Plan</u>: In the ordinary course of its business, the Debtor provides a confidential employee assistance program ("EAP") to provide counseling and other help to Employees who seek the same. Invoices received to date indicate that the Debtor owes at least $292.95 in premiums for maintaining the EAP in place prepetition. The Debtor therefore anticipates that its entire prepetition liability for the EAP program will be under $500 (the "EAP Payments").

28. <u>Disability Insurance</u>: In the ordinary course of its business, the Debtor also provides its Employees with long-term and short-term disability insurance (collectively, the "Disability Insurance"); Debtor estimates that it has incurred a prepetition liability of approximately $4,234 for premiums on the disability Insurance (the "Disability Insurance Payments").

29. <u>Health Insurance</u>: In the ordinary course of its business, Debtor provides health-care benefits for the Employees (the "Health Plan"); Employees may choose among various deductible options. Debtor has coverage for large-scale losses with insurance provider Cypress Benefits Administrator/Phoenix Group ("Phoenix") , which also provides claims processing services. When an employee receives health care services covered by the Health Plan, the Employee submits the health-care provider's bill to Phoenix, which pays the health-care provider and bills back for amounts for which Renew is responsible as self-insurer. If such amounts are

not reimbursed to Phoenix, Debtor believes that Phoenix may seek reimbursement directly from the relevant Employees.  Approximately 55 Employees participate in the Health Plan.

30. Amounts invoiced for claims made by Renew Employees prepetition through December 2008 total $21,462.42; amounts invoiced for insurance premiums, processing, and related fees total $16,521.47, for total contributions owed on account of the Health Plan for Employees of $37,983.89.  The Debtor has not received Phoenix's statement for the prepetition period of January 1 through January 29, but believes that a reasonable estimate would be an equivalent amount of approximately $40,000 in the aggregate for claims, premiums, and related fees (collectively, the "Health Plan Payments").

**Paid Vacation and Holiday Time**

31. In the ordinary course of its business, the Debtor's Employees may take paid vacation days (the "Paid Vacation").  Full-time Employees are entitled, as of the beginning of each calendar year, to a certain amount of paid vacation time, the amount of which depends upon length of service and, in some instances, agreements between the Debtor and specific Employees.  Employees may take vacation upon advance notice to the Debtor and subject to the Debtor's approval.  Employees are paid in January of each year for accrued-but-unused vacation time from the previous year.  Two employees – Mr. White, the CEO, and Todd Foerster, the Site Manager – have chosen not to take payment for unused 2008 vacation time, but intend instead to take such time as vacation during 2009.

32. Although the Debtor believes that payment to Employees for specific vacation days taken postpetition would arguably be a postpetition obligation, just as payment of ordinary postpetition wages and salaries would be, the Debtor realizes that the number of paid vacation days to which an Employee is entitled depends in part on the length of the Employee's

prepetition service to the Debtor. Out of an abundance of caution, therefore, the Debtor asks that it be authorized, but not directed, to act in accordance with its above-described prepetition vacation pay policy postpetition and to pay Employees for any prepetition Paid Vacation taken during the Prepetition Payroll Period; the Debtor estimates that such vacation time amounts to approximately $2,900.96, for a total of 16 vacation days; this amount is included in the Wages to be paid pursuant to this Motion.

33. The Debtor's Employees receive the following paid holidays: New Year's Day; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; Christmas Day, and one other "floating" holiday (the "Paid Holidays"). An Employee will not be paid for a Paid Holiday unless the Employee also works his or her first scheduled day before and after the Paid Holiday, unless the Employee is otherwise on previously approved time off.

34. Entitlement to Paid Holidays is not expressly dependent upon the length of time an Employee has been employed by the Debtor. Moreover, all prepetition Paid Holidays have been included in payroll prior to the February 6 Payroll, and the next Paid Holiday will occur postpetition. Out of an abundance of caution, however, the Debtor asks that ii be authorized, but not directed, to continue its above-described prepetition policy regarding Paid Holidays.

**Payroll Administration and Processing Costs**

35. The Debtor uses Automatic Data Processing, Inc. ("ADP"), to process its payroll, including to directly deposit the appropriate amounts in bank accounts designated by the Employees, issue paper checks where required, and forward Deductions, Withholding Taxes, and Employer-Paid Payroll Taxes to the appropriate entities. The Debtor does not owe any fees to ADP with respect to the Prior Payroll, and ADP will deduct for Debtor's bank account its fee for processing the February 6 Payroll during the week of February 9, 2009. To the extent the Debtor

- 10 -
QB\7298134.3

incurs obligations to ADP incident to the February 6 Payroll, the Debtor requests that it be authorized, but not directed, to pay such, which will arise, in any event, from services rendered by ADP postpetition.

**Authorization of Financial Institutions to Honor Drafts and Electronic Funds Transfers**

36. The Debtor maintains one operating account (the "Operating Account") from which it funds its payroll obligations, including Wages, Deductions, Withholding Taxes, Employer-Paid Payroll Taxes, Employee Reimbursements, Employer 401(k) Amounts, EAP Payments, Disability Insurance Payments, and the Health Plan Payments, as well as processing and other costs incidental to the February 6 Payroll (collectively, the "Employee-Related Obligations"). That operating account is No. 110795 at West Pointe Bank in Oshkosh, Wisconsin. West Pointe Bank is therefore familiar with the Debtor, its business, and its cash management procedures.

37. West Pointe Bank is also the Debtor's proposed interim postpetition lender and is, therefore, well familiar with the existence of Debtor's chapter 11 case.

38. The Employees are required to have their Wages paid via direct deposit; however, Debtor may have issued one or more paper checks prepetition to one or more of its Employees that, as a result of the timing of this chapter 11 case, may not yet have been presented for payment or may not yet have cleared the banking system and, accordingly, may be dishonored, unless the Court authorizes and directs West Pointe Bank to honor these checks.

39. Subject to (a) the Court's February 2, 2009, *Interim Order Approving DIP Financing Facility and Authorizing Use of Cash Collateral of Bankers' Bank* (Docket No. 17); (b) any budget approved in connection therewith; (c) sufficient funds being on deposit in the Operating Account, and (d) the ordinary course policies and procedures of West Point Bank in

QB\7298134.3

connection with the Debtor's Operating Account, the Debtor asks the Court to authorize and direct West Pointe Bank to receive, process, honor and pay all checks presented for payment and all electronic funds transfer requests related to the payments described in this Motion, whether presented prior to or after the Petition Date, upon the receipt by West Pointe Bank of notice of such authorization. The Debtor also requests that West Point Bank be authorized to rely upon the Debtor's designation of any particular check or electronic fund transfer request as appropriate pursuant to this Motion and the Order granting the same.

40. The Debtor anticipates that its cash flow plus the recently-approved postpetition financing facility with West Pointe Bank will provide it with sufficient cash on deposit in the Operating Account to satisfy the Employee-Related Obligations.

**RELIEF REQUESTED,
SUPPORTING AUTHORITY, AND ARGUMENT**

41. The Debtor asks this Court to enter an Order (a) authorizing, but not directing, the Debtors to (i) honor the Employee-Related Obligations and (ii) continue to honor postpetition the Debtor's policies regarding Paid Vacation and Paid Holidays as they existed as of the Petition Date, including honoring payment obligations related thereto, whether such obligations arose prepetition or postpetition; (b) authorizing and directing West Pointe Bank (i) to receive, process, honor, and pay all checks presented and all requested electronic funds transfers that are related to the foregoing and (ii) to rely upon the Debtor's designation of any particular check or electronic fund transfer request as appropriate pursuant to this Motion and the Order granting the same; and (c) approving limited notice of this Motion and related procedures.

42. The relief described herein is requested as part of the Debtor's overall attempt to effect a smooth transition of its business operations into chapter 11 and thereby preserve its going-concern value for the benefit of its creditors. The people employed by the Debtor possess

skills, experience, and an understanding of the Debtor's operations and business that the Debtor will rely upon in its chapter 11 case and that must be retained, if the Debtor is also to retain its value during the chapter 11 process.

43.     All amounts to be paid pursuant to this Motion are included in the budget approved by West Pointe Bank, the Debtor's postpetition lender.  Upon information and belief, West Pointe Bank and Bankers' Bank, the Debtor's senior prepetition secured lender, will consent to payment of the amounts described herein; upon information and belief, U.S. Bank, National Association, indenture trustee (the "Indenture Trustee") for those certain Subordinated Fixed Rate Exempt Facility Revenue Bonds, Series 2007, issued by the Town of Aztalan, Wisconsin, for the benefit of the Debtor, will not object to such payments.

44.     The ability to compensate employees in the ordinary course of business is critical to the Debtor's reorganization efforts and is consistent with Code §§363(c) and 1108, which, together, authorize the continued operation of a business in the ordinary course by chapter 11 debtors.

45.     Moreover, Code §507(a)(4) affords priority status to employee claims for up to $10,950 per individual for prepetition wages and salaries, including vacation pay.  Code §507(a)(5) affords priority to contributions to employee benefit plans, to the extent of (a) the number of employees covered by such plan, multiplied by $10,950, less (b) the sum of (i) the aggregate priority amounts paid to such employees under Code §507(a)(4) and (ii) amounts paid on behalf of such employees under other benefit plans.  Because the Debtor seeks in this Motion to pay its Employees only 13 days' of prepetition Wages, which averages less than $1,500 per Employee, while about 33 Employees participate in the 401(k) plan, about 55 in the Health Plan,

and all are covered by the EAP and Disability Insurance, Debtor's believe that the payments proposed herein come well within the Code §507(a)(5) priority formula.

46. As priority claims, the Employee-Related Obligations must be paid before any general unsecured claims against the Debtor may be satisfied. Accordingly, the relief requested herein as to the Employee-Related Obligations may affect only the timing of the payment of such Employee-Related Obligations and will not prejudice the rights of general unsecured creditors. When it enacted the original Code, Congress contemplated the possibility of such an acceleration of wage payments, "even before all administrative expenses were determined, because most often the employees that worked for the failing enterprise will need the money they receive in payment of their claims to live on." H.R. Rep. No. 95-595 at 358 (1977), *reprinted in* 9 Bankruptcy Service (Lawyers Edition), §82:17, at 370; *see also* S. Rep. No. 95-989 at 69 (1978), *reprinted in* 9 Bankruptcy Service (Lawyers Edition), §83:7, at 91 (noting employees' "urgent need for their wages in the typical cases").[3]

47. Courts in this district have entered similar orders providing for the payment of prepetition employee compensation and benefits on the first day or in the very early stages of other chapter 11 cases. *See, e.g., In re Monarch Holdings, Inc.*, Case No. 08-14796 (Bankr. W.D. Wis. Oct. 8, 2008, Docket No. 218) (Utschig, J.); *In re Northern Bay, LLC*, Case No. 08-13400 (Bankr. W.D. Wis. Aug. 18, 2008, Docket No. 125) (Martin, J.); *In re Paradigm Communications, Inc.*, Case No. 06-10930 (Bankr. W.D. Wis. May 15, 2006, Docket No. 82) (Martin, J.); *In re Eau Claire Mattress Mfg. Corp.*, Case No. 03-12512 (Bankr. W.D. Wis. Apr. 11, 2003, Docket No. 44) (Utschig, T).

---

[3] Congress also noted that it should appear that there will be adequate assets to pay priority claims through Code §§507(a)(4) and 507(a)(5); in this case, the only such claims would be administrative claims under Code §507(a)(2), which, with the Employee-Related Obligations, have been budgeted for and will be funded under the Debtor's recently-approved postpetition financing facility.

- 14 -

QB\7298134.3

48. In addition to the arguments made above, the Debtor's submit that significant, and potentially irreparable, harm could result from the loss of loyalty, goodwill, and dedication that would result from failure to pay the Employees for their prepetition work on behalf of the Debtor. The Debtor relies upon the skills and knowledge of its Employees to produce its products, maintain its physical Plant, and manage its business. The administrative demands of this chapter 11 case have magnified the responsibilities of numerous Employees of the Debtor, as well. Upon information and belief, the Employees generally rely on receipt of their wages and salaries to meet their personal financial obligations. Employees who are made insecure regarding payment for their work may well seek other employment opportunities elsewhere; the resulting lack of institutional knowledge, technical know-how, and sheer manpower, plus the need to replace those that did leave, would add to the responsibilities of the remaining Employees and would impose upon the Debtor costs of recruiting and hiring new personnel at a time when the Debtor is stabilizing operations and attempting to transition to chapter 11. Insecurity as to payment of their wages and benefits would, at minimum, jeopardize Employee morale and performance at a time when both are critical to preserving the Debtor's going-concern value.

49. For these same reasons, Debtor's believe that the value of preserving Employee loyalty, goodwill, and morale does not justify the risk inherent in Debtor's reneging on the obligations to its Employees represented by Employee Reimbursements, Employer 401(k) Amounts, EAP Payments, Disability Insurance Payments, and the Health Plan Payments.

50. As to the Withholding Taxes, federal and state laws require the Debtor to withhold such amounts from Employee wages and turn them over to the appropriate governmental entity. 26 U.S.C. §§6672 and 7501(a). Such amounts are not property of the

- 15 -
QB\7298134.3

Debtor's estate under Code §541, but, rather, are held by the Debtor on behalf of the entities entitled thereto. *See, e.g.*, 26 U.S.C. §7501; *Begier v. United States*, 496 U.S. 53, 60-61 110 S. Ct. 2258, 2264, 110 L. Ed. 2d 46 (1990) (withholding taxes are held in trust and, therefore, are not property of the debtor's estate); Wis. Stats. §71.67(3) (withheld taxes are held in trust for the state of Wisconsin). As to the Employer-Paid Payroll Taxes, claims for such taxes (like claims for unpaid Withholding Taxes) would have priority under Code §507(a)(8) and must be paid before any general unsecured claims against the Debtor may be satisfied. Accordingly, the relief requested herein as to the Employee-Related Payroll Taxes will not prejudice the rights of general unsecured creditors.

## SATISFACTION OF FRBP RULE 6003
## AND WAIVER OF STAY UNDER FRBP 6004(h)

51. FRBP 6003(b) provides that the Court may grant relief regarding the payment of prepetition claims within the first 20 days after the date of the filing of a petition for relief if necessary to avoid immediate and irreparable harm. The Debtor respectfully submits that the priority scheme of the Code, Congress's evident intent to protect employees with wage claims, and the risks to the Debtor of business disruption and harm to its assets during the marketing process satisfy the requirements of FRBP 6003(b).

52. For the reasons set forth above, to the extent FRBP 6004 is applicable to this Motion, the Debtor asks that any Order granting this Motion be exempted from the ten-day stay provided for under FRBP 6004(h), as the imposition of such a stay in connection with a payroll due February 6, 2009, would effectively deprive the Debtor and its Employees of the benefits of the relief requested in this Motion.

## RESERVATION OF RIGHTS

53. This Motion is not a request to assume any contract or agreement with any Employee, and any Order entered granting this Motion should not be deemed to have authorized or ordered the assumption of any employee agreements or employment contracts or policies. The Debtor also reserve its right to exercise ordinary business discretion within its business judgment regarding the payments contemplated herein for particular Employees, and nothing in this Motion or in any Order granting this Motion should be deemed, in and of itself, to confer upon any Employee an entitlement to continued employment, to the continuation of any specific terms of employment, or to any claims of whatever priority against the Debtor or its estate.

## NOTICE

54. At the hearing in the Debtor's case held on February 2, 2009, the Court set a hearing on this Motion for February 4, 2009, at 1:30 p.m. Central time. Pursuant to the discussion held in open Court at that hearing, the Debtor will provide notice of this Motion and of the hearing thereon by electronic mail (where electronic mail addresses are available to the Debtor), telephone, and/or facsimile transmission, to (i) the Office of the United States Trustee, and (ii) counsel for (a) Bankers' Bank, the Debtor's prepetition senior secured lender; (b) the Indenture Trustee for a certain series of revenue bonds; and (c) West Pointe Bank, the Debtor's proposed postpetition lender; and (iii) to the creditors holding the twenty-five (25) largest unsecured claims against the Debtor as set forth on the list filed pursuant to FRBP 1007. Given the nature of the relief requested herein and the nature of the interests of Bankers' Bank, West Pointe Bank, and the Indenture Trustee in the Debtor's assets, the Debtor submits that no other notice is necessary and asks the Court, pursuant to FRBP 9006(c)(1) and 9007, to approve the same.

QB\7298134.3

WHEREFORE, Debtor Renew Energy LLC asks the Court to enter an Order approving and authorizing the relief requested above and granting the Debtor such other and further relief as this Court deems appropriate.

DATED: February 3, 2009   QUARLES & BRADY LLP

By:     /s/ Christopher Combest
Thomas J. Magill (IL ARDC No. 01731009)
Christopher Combest (IL ARDC No. 06224701)
500 West Madison Street, Suite 3700
Chicago, IL 60661
Telephone: (312) 715-5000
Facsimile: (312) 715-5155

and

Thomas A. Simonis, Esq.
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202-4497
Telephone: (414) 277-5000
Facsimile: (414) 271-3552

*Proposed Counsel for Debtor and Debtor in Possession*