IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Renew Energy, LLC

(Chapter 11)

Debtor.

Case No. 09-10491

MEMORANDUM DECISION

Olsen's Mill, Inc. moved for the allowance of two administrative claims in Renew Energy, LLC's Chapter 11 bankruptcy, one under 11 U.S.C. § 503(b)(9) and the other under 11 U.S.C. § 503(b)(1)(A). Renew opposed the motion, and after a hearing, I took the matter under advisement. For the following reasons, the claim under § 503(b)(9) is disallowed and a ruling on the claim under § 503(b)(1)(A) is delayed pending resolution of Renew's preference avoidance action against Olsen's Mill.

Renew operates an ethanol plant in Aztalan, Wisconsin, which processes large quantities of corn. Renew signed a corn supply contract with Olsen's Mill in September 2006. Pursuant to that agreement, Olsen's Mill purchased and supplied enough corn to run Renew's 140 million-gallon plant. Olsen's Mill delivered corn to Renew's plant by a "weigh belt" from a storage elevator leased on premises. Daily tallies based on weight and price of corn delivered were invoiced to Renew.

From the beginning of the supply relationship until September 2008, payment was supposed to be net 20 days, with each payment credited to the oldest outstanding invoice. In

1

practice, however, Olsen's Mill would invoice Renew regularly but would receive payments as Renew had funds available. When paying, Renew's accounting manager sought the best numerical match between cash available and some outstanding invoice. If Renew had $100,000 on hand, it would pay an invoice for $95,000, even if there were an older invoice on the books for $250,000. Renew would then contact Olsen's Mill to report the amount of the wire transfer and the number of the invoice.

Olsen's Mill apparently assented to the procedure until September 2008. At that time, Renew was having financial difficulties and had run up a large outstanding balance with Olsen's Mill. After a meeting with its secured lender, Banc Paribas, on September 16, 2008, Paul Olsen, the part owner and president of Olsen's Mill, told Renew's chief executive officer, Jeff White, that Renew had to prepay for its corn going forward. The accounts payable balance owed to Olsen's Mill could not increase. Renew agreed to pay for its corn daily via wire transfer. Renew based its payments on estimates of how much corn the plant would use that day. Since wire transfers could not be made on non-banking days, Renew had to estimate Saturday and Sunday's usage and prepay for that on Friday. Olsen's Mill refused to ship corn to Renew without a prepayment.[1]

Renew began sending daily wire transfers in round figures that corresponded to its estimated grain usage for the day. Renew and Olsen's Mill kept spreadsheets to track the amount of money wired and the actual grain used. The two companies would periodically compare their figures to "true up" their books. The wire transfers bore the typeface word "PREPAY."

---

[1] On two occasions, Renew estimated too low and actually exhausted its prepayments. Its corn supply was not cut off, though, because Olsen's Mill's accounting systems operated on a 24-hour delay (i.e., the system would not recognize that there was a deficit until 24 hours later, by which time Renew had made another wire transfer anyway).

The payments to Olsen's Mill were not booked as payment in advance for the corn next delivered. Olsen's Mill credited the daily wire transfers to the oldest outstanding invoices and requested that Renew do the same. Complying with that request, a member of Renew's accounting department handwrote on the bottom of each wire transfer the numbers of the oldest invoices. Sometimes the payment was split among many old invoices. As a result, Renew's accounting system showed that older invoices had been paid while newer invoices were listed as outstanding.[2]

The parties still adhered to this method of payment when Renew filed its Chapter 11 petition on January 30, 2009. In the 20 days pre-petition—i.e., from January 10 to January 30, 2009— Olsen's Mill supplied Renew with $5,469,761.77 worth of corn. During that same 20 days pre-petition, Renew made wire transfers to Olsen's Mill totaling $5,420,000. Additionally, on January 9, 2009 (one day prior to the commencement of the 20 day pre-petition period), Renew made a wire transfer of $400,000 to Olsen's Mill intended to pay for grain used on January 9, 10, and 11, 2009. Renew used $261,463.35 worth of grain on January 9, leaving $138,536.65 to be applied toward grain usage on January 10 and 11, both of which days were within the 20 days pre-petition.

Post-petition, Olsen's Mill continued to supply Renew with corn for a short time. The corn supplied was worth $103,053.86. In February 2009, Olsen's Mill entered receivership. The receiver for Olsen's Mill filed these administrative claims. The receiver claims that Olsen's Mill is entitled to both an administrative claim for corn supplied in the 20 days pre-petition pursuant to 11 U.S.C. § 503(b)(9) and an administrative claim for corn supplied post-petition

---

[2] In the schedules submitted to the bankruptcy court with its Chapter 11 petition, this accounting system is evident. For example, on its Schedule F of creditors with unsecured claims, Renew listed invoices had not been paid as of the filing of the petition. All of the invoices issued by Olsen's Mill in the 20 days pre-petition are listed on this schedule as unpaid. However, the older invoices to which wire transfers during the 20 days pre-petition were applied are not listed because, within Renew's accounting system, they were deemed paid.

3

pursuant to 11 U.S.C. § 503(b)(1)(A). Renew objected to the pre-petition expense claim on two grounds: (1) that Olsen's Mill failed to credit the prepayments against the corn supplied within the 20 day period pre-petition and (2) that § 502(d) requires that any administrative claim be disallowed because Olsen's Mill is liable to Renew for preferential transfers under 11 U.S.C. §§ 547 and 550.[3] Renew objected to Olsen's Mill's post-petition claim solely on the ground that 11 U.S.C. § 502(d) requires disallowance due to Olsen's Mill's liability on preferential transfers.[4]

## I.

Section 503(b) of the Bankruptcy Code provides that there shall be allowed

"administrative expenses, including--

> (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business"

In this case, the parties agree on the value of corn Renew received in the 20 days pre-petition. Save for a mention in closing arguments, the parties also have not disputed whether the sales were in the ordinary course. Instead, the issue on this § 503(b)(9) claim is whether Olsen's Mill was fully paid for all corn delivered within 20 days of Renew's bankruptcy filing. If paid for the corn when or before it was delivered, Olsen's Mill has no claim for any unpaid purchase price.[5] A claimant has the burden of establishing its entitlement to an administrative priority

---

[3] Renew filed an adversary complaint against Olsen's Mill on July 27, 2009 asserting clams of preferential transfer under 11 U.S.C. §§ 547, 550, and 551. Renew seeks to avoid not only the $5,420,000 paid in the 20 days pre-petition, but also the $26.8 million it paid Olsen's Mill in the 90 days pre-petition, and the $136.7 million it paid Olsen's Mill in the one year-period pre-petition. This last claim arises from the fact that Olsen's Mill's president and minority shareholder, Paul Olsen, was also a minority shareholder in Renew. Renew contends this constitutes "insider" status under the meaning of the Bankruptcy Code.

[4] At the hearing, Olsen's Mill withdrew its request for immediate payment of administrative claims. Renew had objected to the claims on this ground as well.

[5] Although the language of § 503(b)(9) may embrace the inclusion of "the value of any goods" which have been fully paid for but nonetheless were "received by the debtor within 20 days" among administrative expenses entitled to priority, I am more comfortable limiting the category to goods purchased on credit.

4

claim. In re Michalek, 393 B.R. 642, 644 (Bankr. E.D. Wis. 2008); In re Lunan Family Rests., 194 B.R. 420, 449 (Bankr. N.D. Ill. 1996). Accordingly, Olsen's Mill must show that Renew's payments in the 20 days pre-petition were not prepayments.

There are few cases interpreting § 503(b)(9). One case, cited by both parties and relied upon by Olsen's Mill, is inapposite. The court in In re TI Acquisition, LLC was asked to decide whether a creditor had a § 503(b)(9) claim for supplies delivered in the 20 days pre-petition. 2009 WL 2835200 (Bankr. N.D. Ga. 2009). The parties disputed whether two payments made by the debtor in the 20 days pre-petition were prepayments or payments on old invoices. In that case, though, both parties agreed that they intended the pre-petition payments to be applied to the oldest invoices. Further, the creditor would sometimes ship supplies before receiving payment from the debtor. The facts in our case are significantly different. Here, the parties disagree about how the pre-petition payments were intended to be applied, and Olsen's Mill did not knowingly ship corn without being paid first.

The only other case confronting prepayments under § 503(b)(9) is more instructive. In In re Wetco Rest. Group, LLC, the court disallowed a § 503(b)(9) claim. 2008 WL 1848779 (Bankr. W.D. La. 2008). The parties disputed whether payments made by the debtor in the 20 days pre-petition were prepayments. The court found that the debtor had prepaid, noting that the transactions "had all the indicia of pre-paid goods" even though the creditor booked the payments as paying off the oldest invoices. Id. at *2. In practice, however, the creditor required a payment by wire transfer before it would ship goods and marked the invoices as prepaid.

The facts in this case indicate that both Olsen's Mill and Renew intended the payments in the 20 days pre-petition to be prepayments. In their communications, Olsen's Mill and Renew

repeatedly characterized the payments as prepayments. Renew's chief executive officer testified that Olsen's Mill's president told him in September 2008 that Renew had to prepay for corn going forward. That same month, Banc Paribas emailed Olsen's Mill to confirm that Renew would not receive corn unless it prepaid. Other emails between Renew and Olsen's Mill make clear that Renew was prepaying. In an October 2, 2008, email, for example, a Renew employee told Olsen's Mill to deliver less corn "in order to make sure that we can pay for the corn we are using." In a September 29, 2008 email, a Renew employee tells Olsen's Mill to expect a wire transfer of $650,000 because Renew is "keeping up with our corn consumption for seven days of production."

The parties' actions also show Renew prepaid. Prior to September 2008, Renew was invoiced at net 20 days and paid whenever it could. Its payments were in odd amounts, keyed to match old invoices. After Olsen's Mill asked for prepayments, Renew started sending daily wire transfers in round dollar amounts keyed to estimates of corn usage for that day. Renew's transfers increased on Fridays to compensate for grain usage over the weekend. Both Renew and Olsen's Mill started keeping spreadsheets to track grain usage and payments made. And Renew marked its wire transfers "PREPAY" without objection from Olsen's Mill.

Olsen's Mill argues that these actions are immaterial given that both Renew and Olsen's Mill booked the payments to old invoices. The parties' intent, Olsen's Mill argues, is immaterial given their accounting practices. This argument is unconvincing. First, there was uncontradicted testimony from Renew's chief executive officer and its accounting manager that Renew booked the payments to old invoices because Olsen's Mill asked them to, not because this accounting reflected either party's understanding of the payment arrangement after September 2008. Employees in Renew's accounting department understandably were unaware

that their choice of accounting method might have implications in a bankruptcy. Second, Olsen's Mill offers no reason why the parties' intent should not matter. The Bankruptcy Code certainly imposes no such requirement.[6] Moreover, the courts in TI Acquisition and Wetco relied heavily on evidence about the parties' intent in reaching their decisions.

During the 20 days prior to bankruptcy, Renew received no corn from Olsen's Mill for which it had not previously paid.[7] Supplying that corn gave rise to no claim to which priority might be given.

**II.**

There is still the issue of the § 503(b)(1)(A) claim for corn delivered post-petition. The parties agree on the amount of this claim but disagree about whether allowance of the claim should be postponed pending resolution of an adversary proceeding against Olsen's Mill to recover alleged preference payments. Section 502(d) of the Bankruptcy Code provides that

> "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under §§ 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under § . . . 547 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under §§ 522(i), 542, 543, 550, or 553 of this title."

The parties dispute whether § 502(d) applies to § 503(b) claims. Courts have divided on this issue. The majority position is that § 502(d) does not affect § 503(b) claims. In re Ames Dep't Stores, Inc., 2009 WL 2972510 at *7 (2d Cir. 2009); In re TI Acquisition, LLC, 2009 WL

---

[6] Olsen's Mill argues that the Code's provisions on preference avoidance in 11 U.S.C. § 547 support its position because some courts have looked to accounting methods to establish whether a payment was made on an antecedent debt, an element of a preference under § 547. If anything, however, the analogy to § 547 undermines Olsen's Mill's position. Section 547(c)(1)(A) demands precisely the sort of scrutiny of intent that Olsen's Mill protests (i.e., a transfer is not avoidable if the parties *intended* it to be a contemporaneous exchange and it was in fact such an exchange).

[7] As previously noted, on two occasions, Renew did estimate too low and exhausted its prepayments. Its corn supply was not cut off, though, because Olsen's Mill's accounting systems operated on a 24-hour delay (i.e., the system would not recognize that there was a deficit until 24 hours later, by which time Renew had made another wire transfer).

2835200 at *7 (Bankr. N.D. Ga. 2009); In re Plastech Engineered Prods., Inc., 394 B.R. 147, 161 (Bankr. E.D. Mich. 2008); In re Phoenix Rest. Group, Inc., 2004 WL 3113719 at *20 (Bankr. M.D. Tenn. 2004); In re Roberds, Inc., 315 B.R. 443, 476 (Bankr. S.D. Ohio 2004); In re Lids Corp., 260 B.R. 680, 683-4 (Bankr. D. Del. 2001); In re CM Holdings, Inc., 264 B.R. 141, 157 (Bankr. D. Del. 2000). These courts have been persuaded by many factors, most significantly that § 503(b) allows for payment of "administrative expenses," but § 502(d) only disallows a "claim." Additionally, courts have found that the procedures suggested by the Bankruptcy Code evidence congressional intent to differentiate the allowance of claims from the allowance of administrative expenses. Also, courts have held that § 503(b) and § 502(d) are in irreconcilable conflict, since the former mandates allowance of claims while the latter mandates disallowance.

A minority of courts have found that § 502(d) requires disallowance of § 503(b) claims. Those courts have been persuaded that the definition of a claim in 11 U.S.C. § 101(5) is broad enough to cover administrative expenses. In re MicroAge, Inc., 291 B.R. 503, 513-4 (B.A.P. 9th Cir. 2002); In re Georgia Steel, Inc., 38 B.R. 829, 839-40 (Bankr. M.D. Ga. 1984).

Resolution of this issue may await the existence of a genuine controversy. Until a preference has been found to be recoverable, the application of any limitation in § 502(d) would be premature. The timing of an administrative claim is a matter well within the bankruptcy court's discretion. In re Modern Metal Prods. Co., 2009 WL 1362632 at *3 (Bankr. N.D. Ill. 2009); In re TI Acquisition, LLC, 2009 WL 2835200 at *8 (Bankr. N.D. Ga. 2009); In re Bookbinders' Rest., Inc., 2006 WL 3858020 at *1 (Bankr. E.D. Pa. 2006); In re Global Home Prods., LLC, 2006 WL 3791955 at *3 (Bankr. D. Del. 2006). Notably, the TI Acquisition court opted to delay payment of an administrative claim until it determined liability on a preference avoidance action on facts similar to those in this case.

8

The Bankruptcy Code does not require that administrative claims be paid immediately, and Olsen's Mill has dropped its demand for that treatment. Olsen's Mill's § 503(b)(1)(A) claim is for $103,053.86, while Renew claims that well over $100 million in payments to Olsen's Mill are avoidable preferences. A trial on the matter is scheduled for February 2010. Under these circumstances, I will not decide the allowance of Olsen's Mill's § 503(b)(1)(A) administrative claim until the preference action is resolved.

Accordingly, Olsen's Mill's claim under § 503(b)(9) is disallowed and allowance of its § 503(b)(1)(A) claim is postponed until Renew's adversary proceeding to recover preferences from Olsen's Mill is resolved.

Dated: September 30, 2009

　　　　　　　　　　　　　　　　　　　／s／ Robert D. Martin
ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Renew Energy, LLC

(Chapter 11)

Debtor.

Case No. 09-10491

## ORDER

The Court having reached the conclusions of law contained in the memorandum decision filed this date, it is hereby ORDERED that Olsen's Mill's claim under § 503(b)(9) is DISALLOWED and a ruling on its claim under § 503(b)(1)(A) is RESERVED pending resolution of Renew's preference avoidance action against Olsen's Mill.

Dated: September 30, 2009

_____
ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE